## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:          THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Court No. 21-00595 |
| UNITED STATES, | ) ) ) |
| Defendant, | ) ) ) |
| JIANGSU GUYU INTERNATIONAL TRADING CO., LTD., et al., | ) ) ) ) |
| Defendant-Intervenors. | ) ) ) ) |

## DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

TARA K. HOGAN
Assistant Director

OF COUNSEL:

RACHEL BOGDAN
Office of the Chief Counsel
for Trade Enforcement and
United States Department of
Commerce
Washington, D.C.

BRENDAN JORDAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Washington, D.C. 20044
Tel: (202) 616-0342

July 1, 2022

Attorneys for Defendant

# TABLE OF CONTENTS

I.    The Administrative Determination Under Review ....................2

II.   Issue Presented For Review ........................................................ 2

STATEMENT OF FACTS ........................................................................3

I.    Commerce's Denial Of A Separate Rate For Jinlong.................. 4

II.   Calculation of the Separate Rate  ...............................................7

ARGUMENT ...........................................................................................8

I.    Standard of Review ....................................................................8

II.   Commerce's Denial Of Jinlong's Separate Rate Is Supported By
      Substantial Evidence And In Accordance With Law ............... 11

      A.   Unless The Presumption Of Government Control Is
           Rebutted Commerce Will Deny A Separate Rate Request
           From A Mandatory Respondent From A Non-Market
           Economy ........................................................................... 11

      B.   Jinlong Was On Notice That Its Failure To Fully
           Complete The Questionnaire Would Be Grounds For
           Denying It A Separate Rate ............................................. 12

      C.   Commerce Reasonably Explained Why Failure To Fully
           Complete The Questionnaire Would Be Grounds For
           Denying Jinlong A Separate Rate ....................................19

      D.   Commerce Acted Consistently With Its Practice............ 21

III.  Commerce's Determination Of The Separate Rate Margin Is
      Supported By Substantial Evidence And In Accordance With
      Law   ...................................................................................... 24

i

A.    Commerce Calculates The Separate Rate In Accordance
      With The Statute And SAA ............................................... 25

B.    Commerce Reasonably Utilized The Expected Method In
      Calculating The Separate Rate ....................................... 27

IV.   AMMWF Has Waived The Argument That Commerce Failed To
      Explain Its Decision To Employ The Expected Method In
      Calculating The Separate Rate ................................................. 35

CONCLUSION ............................................................................. 41

## <u>TABLE OF AUTHORITIES</u>

**Cases**
**Page(s)**

*Albemarle Corp. v. United States,*
 821 F.3d 1345 (Fed. Cir. 2016)..........................................................26, 27, 28

*Altx, Inc. v. United States,*
 370 F.3d 1108 (Fed. Cir. 2004).....................................................................10

*AMS Assocs., Inc. v. United States,*
 719 F.3d 1376 (Fed. Cir. 2013).....................................................................15

*Boomerang Tube LLC v. United States,*
 856 F.3d 908 (Fed. Cir. 2017).......................................................................36

*Changzhou Hawd Wood Flooring Co., Ltd. v. United States,*
 848 F.3d 1006 (Fed. Cir. 2017).....................................................................26

*China Manufacturers Alliance, LLC v. United States,*
 1 F.4th 1028 (Fed. Cir. 2021).................................................................12, 31

*Consol. Bearings Co. v. United States,*
 348 F.3d 997 (Fed. Cir. 2003).................................................................23, 39

*Consolo v. Fed. Mar. Comm'n,*
 383 U.S. 607 (1966)........................................................................................9

*Corus Staal v. United States,*
 502 F.3d 1370 (Fed. Cir. 2007)...............................................................36, 39

*Dorbest Ltd. v. United States,*
 604 F.3d 1363 (Fed. Cir. 2010).....................................................................36

*Fujitsu Gen. Ltd. v. United States,*
 88 F.3d 1034 (Fed. Cir. 1996)...............................................................9, 11, 29

*Fuwei Films (Shandong) Co. v. United States,*
   791 F. Supp. 2d 1381 (Ct. Int'l Trade 2011)................................................38

*Huaiyin Foreign Trade Corp. v. United States,*
   322 F.3d 1369 (Fed. Cir. 2003) ....................................................................11

*I.D.I. Int'l Dev. & Inv. Corp. v. United States,*
   Ct. No. 20-00107, Slip Op. 21-82, 2021 WL 3082807 (Ct. Int'l Trade July 6,
   2021) ..............................................................................................................20

*Itochu Bldg. Prods. v. United States,*
   733 F.3d 1140 (Fed. Cir. 2013) ..............................................................37, 38

*JBF RAK LLC v. United States,*
   790 F.3d 1358 (Fed. Cir. 2015) ..............................................................10, 29

*Luoyang Bearing Factory v. United States,*
   240 F. Supp. 2d 1268 (Ct. Int'l Trade 2002).........................................37, 39

*Mark David v. United States,*
   24 F. Supp. 3d 1355 (Ct. Int'l Trade 2014) ................................................18

*Mid Continent Steel & Wire, Inc. v. United States,*
   321 F. Supp. 3d 1313 (Ct. Int'l Trade 2018)...............................................26

*Mitsubishi Heavy Indus., Ltd. v. United States,*
   275 F.3d 1056 (Fed. Cir. 2001) ....................................................................10

*Mittal Steel Point Lisas v. United States,*
   548 F.3d 1375 (Fed. Cir. 2008) ....................................................................38

*National Labor Relations Board v. Nevada Consolidated Copper Corp.,*
   316 U.S. 105 (1942) ........................................................................................9

*PAM, S.p.A. v. United States,*
   582 F.3d 1336 (Fed. Cir. 2009) ......................................................................9

*Philipp Bros. v. United States,*
630 F. Supp. 1317 (1986) .................................................................37, 39

*Prime Time Commerce LLC v. United States,*
396 F. Supp. 3d 1319 (Ct. Int'l Trade 2019)..................................15, 16, 20

*Qingdao Sea-Line Trading Co. v. United States,*
766 F.3d 1378 (Fed. Cir. 2014) .................................................................36

*Samsung Electronics Co. Ltd., v. United States,*
72 F. Supp. 3d 1359 (Ct. Int'l Trade 2015)................................................40

*Sigma Corp v. United States,*
117 F.3d 1401 (Fed. Cir. 1997) ..........................................................4, 11, 18

*Solianus, Inc. v. United States,*
391 F. Supp. 3d 1331 (Ct. Int'l Trade 2019)..........................................32, 33

*Stanley Works Fastening Systems Co., Ltd. v. United States,*
279 F.Supp.3d 1172 (Ct. Int'l Trade 2017) ...............................................38

*U.S. Steel Grp. v. United States,*
96 F.3d 1352 (Fed. Cir. 1996) ....................................................................10

*United States v. Eurodif S.A.,*
555 U.S. 305 (2009) ......................................................................................9

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States,*
716 F.3d 1370 (Fed. Cir. 2013) ..................................................................33

*YC Rubber Co. (N. Am.) LLC v. United States,*
487 F. Supp. 3d 1367 (Ct. Int'l Trade 2020)..............................................35

*Zhongce Rubber Group Co. Ltd., v. United States,*
352 F.Supp.3d 1276 (Ct. Int'l Trade 2018) ...............................................38

**Statutes**

19 U.S.C. 1675..............................................................................................27

19 U.S.C. § 1673d ......................................................................................*passim*

19 U.S.C § 1677e.......................................................................................25

19 U.S.C. § 1677f-1.............................................................................22, 24, 27

28 U.S.C. § 2637(d).....................................................................................36

**Regulations**

19 C.F.R. § 351.309 ....................................................................................39

19 C.F.R. § 351.309(c)(2) ............................................................................36

*Antidumping Proceedings: Announcement of Change in Department Practice for Respondent Selection in Antidumping Duty Proceedings and Conditional Review of the Nonmarket Economy Entity in NME Antidumping Duty Proceedings,*
78 Fed. Reg. 65,963 (November 4, 2013)...............................................22, 28

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Preliminary Results and Partial Rescission of the Antidumping Duty Administrative Review;* 2014-2015,
81 Fed. Reg. 64,131 (Dep't Commerce Sept. 19, 2016)............................34

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results and Partial Rescission of Antidumping Duty Administrative Review; 2014-2015,*
82 Fed. Reg. 15,181 (Dep't Commerce March 27, 2017).........................34

*Certain Steel Nails,*
84 Fed. Reg 55,906 (Dep't Commerce Oct. 18, 2019). .......................21, 23

*Fresh Garlic From the People's Republic of China: Preliminary Results,*
86 Fed. Reg. 67,911 (Dep't Commerce Nov. 30, 2021) ............................24

*Fresh Garlic from the People's Republic of China: Final Results,*

87 Fed. Reg. 16,455 (Dep't Commerce March 23, 2022)...........................24

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
    85 Fed. Reg. 6,896 (Dep't Commerce Feb. 6, 2020) (Initiation Notice)  *pasism*

*Multilayered Wood Flooring from the People's Republic of China: Preliminary
    Results,* 86 Fed. 22,016 (Dep't Commerce April 26, 2021)..............*passim*

*Multilayered Wood Flooring From the People's Republic of China, Final Results
    of Antidumping Duty Administrative Review, Final Successor-in-Interest
    Determination, and Final Determination of No Shipments; 2018-2019*,
    86 Fed. Reg. 59,987 (Dep't of Commerce Oct. 29, 2021) (Final Results)2, 28

*Tapered Roller Bearings,*
    81 Fed. Reg. 45,455 (Dep't Commerce July 14, 2016) ............................33

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the
    People's Republic of China: Final Results*; 2014-2015,
    82 Fed. Reg. 4844 (Dep't Commerce Jan. 17, 2017).................................34

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:       THE HONORABLE M. MILLER BAKER, JUDGE

| | | |
|---|---|---|
| _____ | ) | |
| AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 21-00595 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| JIANGSU GUYU INTERNATIONAL TRADING CO., LTD., et al., | ) ) ) | |
| | ) | |
| Defendant-Intervenors. | ) ) | |
| _____ | ) | |

## <u>ORDER</u>

Upon consideration of the motion for judgment on the agency record filed by the plaintiffs, responses thereto, plaintiffs' reply, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motion is DENIED;

ORDERED that the Department of Commerce's determination is affirmed in all respects; and it is further

ORDERED that judgment is entered in favor of the United States.


_____
JUDGE

Dated: _____

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:        THE HONORABLE M. MILLER BAKER, JUDGE

_____

|  |  |  |
|---|---|---|
| AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Court No. 21-00595 |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) | |
| JIANGSU GUYU INTERNATIONAL TRADING CO., LTD., et al., | ) ) ) ) | |
| Defendant-Intervenors. | ) ) | |

_____)

## DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Defendant, the United States, respectfully submits this response

in opposition to the motion for judgment upon the agency record

(MJAR) submitted by plaintiff American Manufacturers of Multilayered

Wood Flooring (AMMWF).  For the reasons explained below, AMMWF's

motion should be denied because the final results issued by the

Department of Commerce in its 2018-2019 administrative review of an antidumping duty order covering multilayered wood flooring from the People's Republic of China are supported by substantial evidence and in accordance with law.

## STATEMENT PURSUANT TO RULE 56.2(c)

## I.   The Administrative Determination Under Review

AMMWF challenges *Multilayered Wood Flooring From the People's Republic of China, Final Results of Antidumping Duty Administrative Review, Final Successor-in-Interest Determination, and Final Determination of No Shipments; 2018-2019*, 86 Fed. Reg. 59,987 (Dep't of Commerce Oct. 29, 2021) (Final Results), P.R. 280, Appx____[1] and accompanying Issues and Decision Memorandum (IDM), P.R. 279, Appx____.  The administrative review covers entries of subject merchandise made during the period of December 1, 2018, to November 30, 2019.

## II.   Issue Presented For Review

---

[1] "P.R. _" and "C.R._" refer to documents in the public and confidential records, respectively.

2

1.  Whether Commerce's determination that respondent Fusong Jinlong Group[2] (Jinlong) did not qualify for a separate rate because it had failed to rebut the presumption of Chinese government control was supported by substantial evidence and in accordance with law.

2.  Whether Commerce's determination of the margin applied to non-individually examined Chinese multilayered wood flooring companies that demonstrated eligibility for a separate rate was supported by substantial evidence and in accordance with law.

## STATEMENT OF FACTS

On February 6, 2020, Commerce initiated an administrative review of the antidumping duty order covering multilayered wood flooring from China for the period of review December 1, 2018, to November 30, 2019. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 6,896, 6,897 (Dep't Commerce Feb. 6, 2020)

---

[2] The Fusong Jinlong Group includes Dalian Qianqiu Wooden Product Co., Ltd., Fusong Jinlong Wooden Group Co., Ltd., Fusong Jinqiu Wooden Product Co., Ltd., and Fusong Qianqiu Wooden Products Co., Ltd.  *See* Commerce Memorandum, *re: Antidumping Administrative Review of Multilayered Wood Flooring from the People's Republic of China: 2018-2019: Respondent Selection* (Mar. 19, 2020) at n.1, P.R., 156, C.R. 47-48.

(Initiation Notice), Appx____.  As part of this review, Commerce selected Jinlong and another company, Jiangsu Senmao Bamboo and Wood Industry, Co., Ltd. (Senmao), as the mandatory respondents, because these two were the largest exporters of Chinese multilayered wood flooring by volume.  PDM at 5-6, Appx____.

## I.    Commerce's Denial Of A Separate Rate For Jinlong

For non-market economies, such as China, Commerce presumes a respondent is government-controlled and therefore subject to a single country-wide rate unless the respondent can establish the absence of government control.  *See* PDM at 10, Appx____ (*citing* Policy Bulletin 05.1: Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries, available at http://ia.ita.doc.gov/policy/bull05-1.pdf); *see also, e.g., Sigma Corp v. United States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997).

A company that wishes to overcome this presumption that it is government-controlled and therefore subject to a country-wide rate, must provide certain information to Commerce.  In this proceeding, the Initiation Notice contained instructions on what information Commerce would need from an entity to evaluate whether it could qualify for a

separate rate from the country-wide rate.  *See Initiation Notice,* 85 Fed. Reg. at 6,897, Appx____.  Specifically, the notice instructed such firms to "complete, as appropriate, either a separate rate application or certification," and explained that "in order to demonstrate separate rate eligibility, Commerce requires entities for whom a review was requested, that were assigned a separate rate in the most recent segment of this proceeding in which they participated, to certify that they continue to meet the criteria for obtaining a separate rate."  *Id.* Additionally, the notice explained that "{f}or exporters and producers who submit a Separate Rate Application or Certification and subsequently are selected as mandatory respondents, these exporters and producers will no longer be eligible for separate rate status unless they respond to all parts of the questionnaire as mandatory respondents."  *Id.*

Jinlong filed a separate rate certification on March 9, 2020.  P.R. 140, C.R. 41, Appx____.  Thereafter, on March 19, 2020, Commerce selected Jinlong and Senmao as the mandatory respondents.  PDM at 5-6, Appx____; IDM at 1, Appx____.  On March 25, 2020, Commerce issued its initial questionnaire to Jinlong and Senmao.  Initial Questionnaire,

P.R. 160, Appx____.  Section A of the initial questionnaire focuses on

questions relating to the entity's "Organization, Accounting Practices,

Markets and Merchandise."  *See* P.R. 160, at Section A.  On April 4,

2020, Jinlong reported to Commerce that it would not be filing a

response to Commerce's questionnaire or further participate in

Commerce's proceeding, notwithstanding Commerce's clear instructions

that its failure to do so would prevent it from obtaining separate rate

status.  Letter from Jinlong, April 14, 2020, P.R. 170, Appx____.

Commerce did receive questionnaire responses from Senmao.  PDM at

3, Appx____.

In the preliminary results, Commerce determined that Jinlong did

not establish eligibility for a separate rate because it failed to respond

to Commerce's initial questionnaire, Section A of which included

questions relevant to demonstrating eligibility for a separate rate.  *See*

*Multilayered Wood Flooring from the People's Republic of China:*

*Preliminary Results*, 86 Fed. Reg. 22,016 (Dep't Commerce April 26,

2021), P.R. 249, Appx____; Preliminary Decision Memorandum (PDM),

April 19, 2021, P.R. 238, at 14, Appx____.  Commerce explained that

consistent with the Initiation Notice and prior practice, companies that

file separate rate certifications and are later selected as mandatory

respondents are not considered eligible for a separate rate "unless they

respond to all parts of the questionnaire as mandatory respondents."

*Id.* at 14, Appx____; *Initiation Notice,* 85 Fed. Reg. at 6,897, Appx____.

Jinlong did not respond to all parts of the questionnaire as was required

for a mandatory respondent, including the Section A questionnaire, and

Commerce found that it therefore did not rebut the presumption of

government control.  IDM at 18, Appx____.  Because Jinlong failed to

rebut the presumption of government control, Commerce determined

Jinlong was part of the China-wide entity and assigned it the China-

wide rate.

Commerce made no changes to this determination in its final

results.  *See* IDM at 17-21, Appx____.

## II.   **Calculation of the Separate Rate**

In addition to finding that Jinlong was part of the China-wide

entity, Commerce calculated a zero percent margin for the second

mandatory respondent, Senmao.  PDM at 16, Appx____.  Because the

China-wide entity was not under review and Jinlong was found to be

part of the China-wide entity and assigned the corresponding China-

wide rate, Commerce did not consider Jinlong's assigned (China-wide) margin for purposes of calculating the separate rate. IDM at 20, Appx____. Accordingly, consistent with 19 U.S.C. § 1673d and the Statement of Administrative Action accompanying the Uruguay Agreements Act (SAA), Commerce employed the "expected method" to calculate the separate rate because the only other individually examined respondent, Senmao, received a zero percent margin. *Id.* Thus, Commerce calculated a zero percent rate for the separate rate respondents. *Id.*

On October 29, 2021, Commerce published its final results reflecting its determinations regarding Jinlong's status as part of the China-wide entity and the calculation of margin for non-individually examined respondents.

## **ARGUMENT**

### I.   **Standard of Review**

In reviewing Commerce's antidumping duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion' found by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with

law." *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)). "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). "Substantial evidence" amounts to "more than a mere scintilla" of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009). Substantial evidence is also "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent {Commerce's} finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

The agency's findings may still be supported by substantial evidence even if the possibility of drawing two inconsistent conclusions exists. *See National Labor Relations Board v. Nevada Consolidated Copper Corp.*, 316 U.S. 105, 106 (1942). Therefore, the question before the Court is not whether the court agrees with Commerce's decision or whether the court would have reached the same decision. Rather, a

determination will be affirmed if it is "reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion." *Altx, Inc. v. United States*, 370 F.3d 1108, 1121 (Fed. Cir. 2004). A party challenging a determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001).

Finally, this Court affords Commerce an especially great deal of deference "when a statute fails to make clear 'any Congressionally mandated procedure or methodology for assessment of the statutory tests.'" *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (quoting *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1362 (Fed. Cir. 1996)). In that circumstance, "Commerce 'may perform its duties in the way it believes most suitable.'" *Id.* (quoting *U.S. Steel Grp.*, 96 F.3d at 1362). Consequently, Commerce receives "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when it exercises its technical expertise to select and apply methodologies to implement

the dictates of the trade statute.  *Fujitsu General, Ltd. v. United States*, 88 F.3d at 1039.

## II.   Commerce's Denial Of Jinlong's Separate Rate Is Supported By Substantial Evidence And In Accordance With Law

### A. Unless The Presumption Of Government Control Is Rebutted Commerce Will Deny A Separate Rate Request From A Mandatory Respondent From A Non-Market Economy

In proceedings involving a non-market economy country such as China, Commerce maintains a rebuttable presumption that all companies within the country are subject to government control and, thus, should be assessed a single antidumping duty rate, *i.e.*, the non-market economy presumption.  *Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1372 (Fed. Cir. 2003); *Sigma Corp.*, 117 F.3d at 1404-06.  Commerce's policy is to assign all exporters of the subject merchandise in a non-market economy proceeding a single antidumping duty rate unless an exporter can affirmatively demonstrate an absence of government control, both in law (*de jure*) and in fact (*de facto*), with respect to its export activities or functions.  *Sigma*, 117 F.3d at 1405.  If an exporter cannot make such a demonstration, it will not qualify for a separate rate and will receive the rate assigned to the non-market

economy-wide entity.  The lawfulness of Commerce's non-market

economy presumption and the application of a single antidumping duty

rate to the non-market economy-wide entity have been sustained by the

Federal Circuit.  *See China Manufacturers Alliance, LLC v. United*

*States*, 1 F.4th 1028, 1030-31 (Fed. Cir. 2021).

### B. Jinlong Was On Notice That Its Failure To Fully Complete The Questionnaire Would Be Grounds For Denying It A Separate Rate

As a mandatory respondent, Jinlong's eligibility for a separate

rate was dependent on how it responded to Section A of the

antidumping questionnaire.  Commerce informed all parties, including

Jinlong, that failure to complete Section A of the questionnaire would

result in it not receiving a separate rate.  *See Initiation Notice*, 85 Fed.

Reg. at 6,897, Appx____.  Nevertheless, Jinlong failed to provide

Commerce with a Section A questionnaire response.  PDM at 14,

Appx____.  Accordingly, Commerce did not have the record information

necessary to complete a separate rate analysis and determine whether

Jinlong's export operations were free from *de facto* and *de jure*

government control.  Therefore, Commerce determined that Jinlong

failed to rebut the presumption of government control and was thus not eligible for a separate rate.  IDM at 18, Appx____.

Section A of Commerce's questionnaire requests that companies respond to over twenty questions involving economic, industry, and company-specific information relevant for determining whether a company is free from *de facto* or *de jure* government control.  *See* Section A Questionnaire, P.R. 160, at Section A.2, Appx____ (discussing "Separate Rates").  A respondent's answers to these questions shed light on whether there are any government measures in place that restrict the respondent's autonomy or decision making, whether a government reaps a financial benefit from the enterprise, and whether the government has a role in pricing, among other factors relevant to assessing *de facto* or *de jure* government control.  *Id.*; *see also* PDM at 12, Appx____.

In addition, Commerce's standard separate rate certification cited in Commerce's Initiation Notice states that "{t}here is a possibility that your firm may be selected as a mandatory respondent, in which case your firm will be required to respond to {Commerce}'s antidumping questionnaire *in full* in order to retain eligibility for consideration of

13

separate rate status." *See* Separate Rate Certification For Firms

Previously Awarded Separate Rate Status (available at

https://enforcement.trade.gov/nme/sep-rate-files/cert-20150323/prc-sr-

cert-20150323.pdf) (emphasis added); *see also Initiation Notice*, 85 Fed.

Reg. at 6,897, Appx____.

Because a company's corporate structure, ownership, or

relationship with the government may change from one segment of a

proceeding to the next, Commerce requires companies to establish their

separate rate eligibility in each segment of a proceeding.  In addition,

what may have constituted a sufficient showing of eligibility for a

separate rate at an earlier stage in a segment of the proceeding may not

be sufficient without additional information at a later stage in a

segment of a proceeding given that circumstances may be different at

different stages.  Although Jinlong earlier provided Commerce with a

separate rate certification, it did not provide any additional information

necessary to evaluate its entitlement to a separate rate when selected

as a mandatory respondent later on in the process.  IDM at 18,

Appx____.  The information requested in Commerce's Section A

questionnaire solicits information in addition to the information

14

provided in a separate rate certification.  P.R. 160, at Section A.2,

Appx____ (requesting, for example, information regarding who owns

and controls the company, the company's relationship with national and

local governments, copies of business licenses, and any controls on

exports of the merchandise under consideration).  Accordingly,

Commerce reasonably determined that Jinlong, as a mandatory

respondent, did not rebut the presumption of government control

because it failed to answer the Section A questions.  IDM at 18,

Appx____.  Commerce, therefore, appropriately applied the China-wide

rate to Jinlong.  *See AMS Assocs.*, 719 F.3d at 1379 (holding that, when

a mandatory respondent is not separate from the China-wide entity

and, thus, does not qualify for a separate rate, Commerce could apply

the China-wide rate.).

This Court has recognized the lawfulness of Commerce's practice

of conditioning a separate rate finding on receiving Section A

questionnaire responses from mandatory respondents.  *See Prime Time*

*Commerce LLC v. United States*, 396 F. Supp. 3d 1319, 1332-33 (Ct.

Int'l Trade 2019).  Commerce explained that it has consistently required

Section A questionnaire responses from mandatory respondents because

it solicits information necessary to determine whether the respondent is free from *de jure* and *de facto* government control.  IDM at 18, Appx____.  The Court has recognized Commerce's need for such responses in similar circumstances.  *Prime Time*, 396 F. Supp. 3d at 1332-33.  The reasoning of *Prime Time* should apply here.

Contrary to AMMWF's assertion, *Prime Time* supports Commerce's determination that Jinlong was not entitled to a separate rate.  *See* MJAR at 30.  In *Prime Time*, an importer of pencils from China challenged Commerce's determination to assign the China-wide entity rate to its Chinese exporter, Homey, the mandatory respondent in that review.  *Prime Time*, 396 F. Supp. 3d at 1322.  During the administrative review challenged in *Prime Time*, Homey filed a separate rate application, was selected as a mandatory respondent, and thereafter stopped participating in the review.  *Id.* at 1323.  As the Court summarized, "Homey, as both a separate rate applicant and a mandatory respondent, had to satisfy dual obligations—submit a separate rate application and *answer all questionnaires* required of it as a mandatory respondent—or become ineligible for separate rate status." *Id.* at 1325 (emphasis added).

16

The Court agreed with Commerce's determination that Homey was ineligible for a separate rate because it failed to respond to Commerce's Section A Questionnaire, holding that "it is Homey's burden to rebut the presumption." *Id.* at 1333. Similarly, here, Commerce found that mandatory respondent Jinlong failed to establish its eligibility for a separate rate because it failed to submit a Section A questionnaire response and thus, Commerce was unable to perform a separate rate analysis, notwithstanding the fact that Jinlong filed a separate rate certification. IDM at 18, Appx____.

AMMWF's assertion that Commerce should have granted separate rate status to Jinlong on the basis of Jinlong's separate rate certification is also not persuasive. MJAR at 29. To discern one's separate rate eligibility, Commerce will often request additional information from mandatory respondents based on their Section A questionnaire responses. For example, in *Wooden Bedroom Furniture*, although mandatory respondent Maoji submitted a separate rate certification indicating its corporate structure had not changed from when it had previously obtained a separate rate, it provided information in its Section A response that presented conflicting information and

raised questions as to whether the company's ownership structure had in fact changed. *See Wooden Bedroom Furniture from the People's Republic of China*, 78 Fed. Reg. 35,249 (Dep't Commerce June 12, 2013), and accompanying Issues and Decision Memorandum at Comment 1. As a result, Commerce asked follow-up questions to determine Maoji's separate rate eligibility. This demonstrates that the presumption of government control is not necessarily overcome by only filing a separate rate certification. Likewise, in *Mark David v. U.S.*, this Court sustained, as lawful, Commerce's conclusion that the respondent "failed to demonstrate its absence of government control" where the mandatory respondent submitted a separate rate certification but nonetheless failed "to respond to Commerce's questionnaires regarding its separate rate eligibility during the review." 24 F. Supp. 3d 1355, 1359 (Ct. Int'l Trade) (citing *Sigma Corp. v. U.S.*, 117 F.3d 1401, 1405 (Fed. Cir. 1997)).

Commerce did not deny separate rate status to Jinlong based purely on its instruction in the Initiation Notice that a company selected as a mandatory respondent would have to respond to Commerce's questionnaires beyond the separate rate certification or

application to be eligible for that separate rate.  *See Initiation Notice*, 85

Fed. Reg. at 6,897, Appx____.  Rather, Commerce's decision was based on

Jinlong's failure to provide the substantive information that this

instruction called for, which would have provided the information

necessary for Commerce to determine whether Jinlong was eligible for a

separate rate.  IDM at 18, Appx____.

### C. Commerce Reasonably Explained Why Failure To Fully Complete The Questionnaire Would Be Grounds For Denying Jinlong A Separate Rate

Contrary to AMMWF's assertion, MJAR at 29, Commerce

adequately explained its determination that Jinlong failed to rebut the

presumption of government control, and in doing so, addressed the

record evidence, including Jinlong's separate rate certification.

Commerce acknowledged that Jinlong filed a separate rate certification,

but explained that consistent with its practice, a party selected for

individual examination is required to submit a Section A questionnaire

response to allow Commerce to perform an analysis of whether the

company is free from government control.  IDM at 18, Appx____.

Commerce explained that the respondent has the burden of rebutting

the presumption of government control, including the burden of

producing the requisite information for Commerce's analysis.  IDM at
18 n.103, Appx____ (citing *I.D.I. Int'l Dev. & Inv. Corp. v. United States*,
Ct. No. 20-00107, Slip Op. 21-82, 2021 WL 3082807 (Ct. Int'l Trade July
6, 2021) (explaining that "{t}he applicant has this burden because it is
the party with the best access to information pertinent to the state
control issue{,}" and that "{t}he burden of production should belong to
the party in possession of the necessary information.") (internal
punctuation and citations omitted); *see also Prime Time Commerce LLC
v. United States*, 396 F. Supp. 3d at 1325 ("{a mandatory respondent},
as both a separate rate applicant and a mandatory respondent, had to
satisfy dual obligations—submit a separate rate application and answer
all questionnaires required of it as a mandatory respondent—or become
ineligible for separate rate status").

Commerce provided a reasonable basis for declining to consider
Jinlong's separate rate certification:  the record lacked information that
would permit Commerce to perform a separate rate analysis.  That gap
in the record was based upon Jinlong's decision not to submit a Section
A questionnaire response.  Commerce's determination is lawful and
should be sustained.

20

### D. **Commerce Acted Consistently With Its Practice**

AMMWF challenges Commerce's determination here on the basis that Commerce granted separate rate status to certain companies that only filed a separate rate certification in this review. *See* MJAR at 28. This argument fails to show that Commerce has acted contrary to law or its decision is unsupported by substantial evidence. Rather, Jinlong's status as a mandatory respondent subject to individual examination explains the differential treatment that AMMWF identifies. Respondents subject to review but not selected for individual examination are not required to submit a full Section A questionnaire response.

AMMWF cites the *Certain Steel Nails from the People's Republic of China* case as an example where Commerce took a different approach to granting a separate rate when a mandatory respondent failed to respond to the Section A questionnaire. MJAR at 31-32 (citing 84 Fed. Reg. 55,906 (Dep't Commerce Oct. 18, 2019)). However, *Steel Nails* involved a different statutorily prescribed methodology in limiting individual examination, sampling. The accompanying methodology justified Commerce's differing approach in determining companies'

separate rate status. *Certain Steel Nails*, 84 Fed. Reg. at 55,907; *see also* 19 U.S.C. § 1677f-1(2)(A) (providing that Commerce may limit examination to a sample of exporters, producers, or types of products that is statistically valid).

In a 2013 Federal Register notice, Commerce detailed its respondent selection sampling methodology and explained that "{i}n {non-market economy} cases, only those exporters who receive a separate rate will be included in the sample population" and "in order to establish the appropriate sample population at the time of the sampling selection, it is necessary for the Department to make its determinations regarding the separate rate status of the companies under review before the sample is determined." *Antidumping Proceedings: Announcement of Change in Department Practice for Respondent Selection in Antidumping Duty Proceedings and Conditional Review of the Nonmarket Economy Entity in NME Antidumping Duty Proceedings*, 78 FR 65963, 65964, 65969 (November 4, 2013). Thus, in accordance with the statute and Commerce's practice in selecting mandatory respondents using its sampling methodology, Commerce first determined whether the companies subject to review demonstrated

eligibility for a separate rate before it considered whether a party

eligible for respondent selection. *See Certain Steel Nails,* 84 Fed. Reg.

55,906, and accompanying Preliminary Decision Memorandum.  By

contrast, here, Commerce selected two respondents for individual

review based on volume of exports. *See* PDM at 15, Appx____; IDM at

18, Appx____.  Respondents subject to review but not selected for

individual examination are not required to submit a full Section A

questionnaire response.  IDM at 18, Appx____.  Accordingly, *Steel Nails*

does not demonstrate any reversible error in Commerce's decision.

Moreover, Commerce's denial of Jinlong's separate rate under

these circumstances is consistent with its established practice. *See*

*Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir.

2003) (an agency's decision is arbitrary when, among other things, it

deviates from an established practice followed in circumstances without

reasonable explanation).  For example, Commerce took the same

approach in the 2019-2020 review of garlic from China where a

company filed a separate rate certification, was then selected for

individual examination but failed to respond to Commerce's Section A

questionnaire response.  There, Commerce found the mandatory

respondent to be part of the China-wide entity and assigned it the China-wide entity rate.  *See Fresh Garlic From the People's Republic of China: Preliminary Results*, 86 Fed. Reg. 67,911 (Dep't Commerce Nov. 30, 2021), and accompanying Preliminary Decision Memorandum, unchanged in *Fresh Garlic from the People's Republic of China: Final Results*, 87 Fed. Reg. 16455 (Dep't Commerce March 23, 2022).

Accordingly, Commerce's determination that Jinlong did not rebut the presumption and was therefore ineligible for a separate rate was supported by substantial evidence and in accordance with law.

## III.   Commerce's Determination Of The Separate Rate Margin Is Supported By Substantial Evidence And In Accordance With Law

The statute and Commerce's regulations do not address the establishment of a sample pool rate or a "separate rate" to be applied to individual respondents not selected for individual examination when Commerce limits its examination in an administrative review pursuant to 19 U.S.C § 1677f-1(c)(2).  Thus, Commerce looks to 19 U.S.C. § 1673d(c)(5)(B), which provides instructions for calculating the all-others rate in an investigation, for guidance when calculating the rate for

24

separate-rate respondents which Commerce did not examine individually in non-market economy cases.

### A. Commerce Calculates The Separate Rate In Accordance With The Statute And SAA

The statute Commerce looks to for guidance in calculating the separate provides that the rate is normally "an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and *de minimis* margins, and any margins determined entirely under {19 U.S.C. § 1677e, *i.e.*, on the basis of facts available}."  19 U.S.C. § 1673d(c)(5)(A).  Thus, when the weighted-average dumping margins established for all individually investigated respondents are zero, *de minimis*, or based entirely on facts available pursuant to 19 U.S.C. § 1673d(c)(5)(A), the statute permits Commerce to "use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated." 19 U.S.C. § 1673d(c)(5)(B).

Congress has expressed a preference for the expected method, stating that when "the dumping margins for all of the exporters and producers that are individually investigated are determined entirely on the basis of the facts available or are zero or *de minimis* … {t}he expected method in such cases will be to weight-average the zero and the de minimis margins and margins determined pursuant to the facts available."  SAA at 873; *see also Changzhou Hawd Wood Flooring Co., Ltd. v. United States*, 848 F.3d 1006, 1011-12 (Fed. Cir. 2017).  In addition, if the expected method is "not feasible" or "results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers," Commerce may use "other reasonable methods" to calculate the non-investigated exporters or producers' rate.  *Id.*; *see also Albemarle Corp. v. United States*, 821 F.3d 1345, 1352 (Fed. Cir. 2016).

The Court has sustained Commerce's practice of applying the expected method approach when calculating the rate for separate-rate respondents which Commerce did not examine individually in an administrative review.  *See, e.g.*, *Mid Continent Steel & Wire, Inc. v. United States*, 321 F. Supp. 3d 1313, 1320 (Ct. Int'l Trade 2018) (citing

*Albemarle*, 821 F.3d at 1352).  The Federal Circuit has likewise

recognized that averaging the rates of individually examined exporters

and producers is the "expected method" for calculating separate rates.

*Albemarle*, 821 F.3d at 1349.

### B. Commerce Reasonably Utilized The Expected Method In Calculating The Separate Rate

Commerce employed the expected methodology in this review.

Because it determined that it would not be practicable to individually

examine all companies for which an administrative review was

initiated, Commerce selected the two largest exporters by volume as

mandatory respondents in this review, Jinlong and Senmao.

Respondent Selection Memorandum (March 19, 2020) (P.R. 156),

Appx____; PDM at 3, 5, Appx____; *see also* 19 U.S.C. § 1677f-1(c)(2)(B).

Commerce determined that Jinlong was part of the China-wide entity,

an entity that was not under review and whose rate was thus not

subject to change,[3] and that the remaining individually examined

---

[3] In 2013, Commerce announced that the non-market economy (NME)-wide entity would no longer be reviewed unless Commerce receives a request for review of the NME-wide entity or self-initiates a review of the entity.  Accordingly, consistent with section 751 of the Act {19 U.S.C. 1675}, if a review is requested of the NME-wide entity in an administrative review, under its current practice, Commerce will review

respondent, Senmao, had a zero margin.  PDM at 14-16, Appx____; *see also* IDM at 20, Appx____; *see also Final Results*, 86 Fed. Reg. 59,987, Appx____.  Thus, in accordance with the "expected method" for calculating a separate rate margin, Commerce assigned to all eligible non-selected respondents the weighted average of the zero percent rate calculated for Senmao.  PDM at 16, Appx____; *see also* IDM at 21, Appx____; *see also* SAA at 873.

Commerce's calculation of the separate rate was in accordance with law.  Commerce did not determine that use of the expected method would produce a margin that is not reasonably reflective of the non-selected companies' dumping margins or would not be feasible.  PDM at 16, Appx____; *see also Albemarle*, 821 F.3d at 1352 (holding that when all individually examined respondents are assigned *de minimis* margins, Commerce may use other reasonable methods only if it

_____

the NME-wide entity and determine a rate potentially different from the rate determined in the underlying investigation. *See Antidumping Proceedings: Announcement of Change in Department Practice for Respondent Selection in Antidumping Duty Proceedings and Conditional Review of the Nonmarket Economy Entity in NME Antidumping Duty Proceedings*, 78 FR 65963, 65970 (November 4, 2013).  AMMWF does not challenge Commerce's conditional review practice of the NME-wide entity.

determines the expected method is not feasible or would not be

reasonably reflective of potential dumping margins).  Accordingly,

Commerce used the expected method in calculating the non-individually

examined respondent's separate rate.  PDM at 16, Appx____; IDM at 20,

Appx____.

The manner in which Commerce calculated the separate rate

margin using the expected method was also lawful.  AMMWF

oversimplifies the nuances of Commerce's non-market economy practice

and the discretion afforded to Commerce in determining the separate

rate margin in non-market economy cases where one mandatory

respondent received a zero rate and the other was placed in the China-

wide entity.  Indeed, because Congress has not directed that Commerce

calculate the separate rate in a non-market economy proceeding in any

particular way, Commerce may "perform its duties in the way it

believes most suitable." *See JBF RAK LLC*, 790 F.3d at 1363; *see also*

*Fujitsu General, Ltd.*, 88 F.3d at 1039.

Commerce reasonably exercised its technical expertise in only

utilizing Senmao's zero rate to calculate the margin for non-individually

examined entities because when "individually investigated {producers

have} zero or de minimis margins," Commerce can include them in the separate rate calculation pursuant to the expected method. *See* 19 U.S.C. § 1673d(c)(5)(B). The expected method does not permit the rates of non-individually investigated entities to be included and because Jinlong was part of the China-wide entity, which was not individually investigated, it was reasonable for Commerce to not include them in the calculation. *See id.*

Further, contrary to AMMWF's assertion, MJAR at 16, Commerce explained the basis for excluding Jinlong's margin when employing the expected method, despite Jinlong's status as an individually examined company in the review. IDM at 20, Appx____.

Commerce explained that whether a company successfully rebuts the presumption or not determines whether the company is assigned an individual rate or will receive the rate for the non-market economy-wide entity. *Id.* As we explained above, although Jinlong was selected for individual examination as a mandatory respondent, it failed to rebut the presumption of government control. *Id.* Thus, rather than determining an individual rate for Jinlong, Commerce assigned Jinlong the rate for the China-wide entity by "pulling-forward" the entity's rate

that was determined in a prior segment of this proceeding. *Id.* (*citing China Manufacturers Association*, 1 F.4th at 1039-40).

Further, Commerce explained that because "there was no request for review of the China-wide entity, pursuant to its practice, the entity's rate was not subject to review or change (and, therefore, the entity itself was not under individual examination)." IDM at 20, Appx____. Accordingly, contrary to AMMWF's assertion, MJAR at 19, Commerce identified a relevant distinction between an individual rate that would have been calculated for Jinlong had it demonstrated independence from government control and the China-wide rate assigned to Jinlong that was simply pulled forward from a prior review because the China-wide entity was not under review. Thus, because Jinlong was assigned the rate for the China-wide entity, a rate that was not subject to change because the entity itself was not under individual examination, the China-wide entity rate assigned to Jinlong was not under consideration for purposes of employing the expected method to determine the separate rate. *Id.* Rather, Commerce found that the only rate under consideration pursuant to the expected method is the calculated margin for the sole mandatory respondent which established its eligibility for a

separate rate, *i.e.*, Senmao's margin. *Id.* Accordingly, Commerce relied
on Senmao's margin for the separate rate companies through use of the
expected method. *Id.* Commerce meaningfully addressed AMMWF's
arguments below that Commerce deviated from the expected method.
*See id.*; *see also* MJAR at 23.

Moreover, contrary to AMMWF's assertion, MJAR at 21,
Commerce determined Jinlong was individually examined in the
review. IDM at 20, Appx____. However, the fact that Jinlong was
individually investigated does not mean that its margin will necessarily
be incorporated into the expected method rate calculation.

Despite AMMWF's claim to the contrary, *Solianus, Inc. v. United
States,* 391 F. Supp. 3d 1331 (Ct. Int'l Trade 2019), does not compel
Commerce to calculate the separate rate differently. *See* MJAR at 21-
23. AMMWF argues that *Solianus* stands for the proposition that "'if a
firm is chosen as a mandatory respondent to an investigation, it is
individually investigated' for purposes of determining the margin
applicable to companies that are not individually examined." *Id.* at 23
(citing *Solianus*, 391 F. Supp. 3d at 1338-39). However, this holding
was made where the respondents were from a market economy county

and where the plaintiff was seeking to exclude from the calculation of the all-others rate the rates assigned to particular respondents based on their failure to cooperate.  Here, Jinlong's exclusion from the calculation is not based on its lack of cooperation, but the fact that it is part of the China-wide entity.

The fact that *Solianus* cited *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) does not change this result.  *See* MJAR at 22.  In *Bestpak*, the Federal Circuit found that the unique factual circumstances present in that proceeding rendered "a simple average of a *de minimis* and AFA China-wide rate unreasonable as applied."  716 F.3d at 1378.  Here, Commerce did not take the average of the *de minimis* margin, Senmao, and the China-wide rate.

Commerce's approach is consistent with its practice in non-market economy cases where the mandatory respondents are not eligible for a separate rate and are, therefore, included as part of the NME-wide entity, and there is no individual calculated rate or the only rate is zero, *de minimis*, or based entirely on facts available.  *See* IDM at 20, Appx____ (citing *Tapered Roller Bearings* 81 Fed. Reg. 45,455 (Dep't Commerce July 14, 2016), and accompanying Preliminary Decision

Memorandum at 9, unchanged in *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results*; 2014-2015, 82 Fed. Reg. 4844 (Dep't Commerce Jan. 17, 2017)) (determining a zero percent separate rate where two mandatory respondents received a zero percent rate and one mandatory respondent was determined to be part of the China-wide entity); *see also Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Preliminary Results and Partial Rescission of the Antidumping Duty Administrative Review;* 2014-2015, 81 Fed. Reg. 64,131, 64,133 (Dep't Commerce Sept. 19, 2016)*,* unchanged in *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results and Partial Rescission of Antidumping Duty Administrative Review; 2014-2015,* 82 Fed. Reg. 15,181 (Dep't Commerce March 27, 2017) (determining that "there is no {period of review} margin information available for the Department to consider in assigning a margin for eligible separate rate companies not individually examined" where none of the mandatory respondents in the review qualified for a separate rate and were, therefore, considered a part of the non-market economy entity).

In addition, AMMWF's discussion of *YC Rubber* misunderstands Commerce's reliance on that decision.  *See* MJAR at 20.  Commerce relied on *YC Rubber* to address AMMWF's argument below that Commerce did not employ the expected method because it only averaged one rate in determining the separate rate.  IDM at 21, Appx____ (citing *YC Rubber Co. (N. Am.) LLC v. United States*, 487 F. Supp. 3d 1367 (Ct. Int'l Trade 2020)).  In that case, this Court rejected a party's assertion that "the statutory reference to an 'average' in section {735(c)(5)(A)} requires more than one rate."  487 F. Supp. 3d. at 1376.

Although AMMWF continues to challenge Commerce's determination not to include Jinlong's China-wide rate in determining the separate rate here, AMMWF does not continue to argue that the use of a single rate to determine the weighted-average rate for the non-selected separate rate companies is inherently unlawful.  Thus, *YC Rubber* is not relevant to the issues presented in this MJAR proceeding.

## IV.    AMMWF Has Waived The Argument That Commerce Failed To Explain Its Decision To Employ The Expected Method In Calculating The Separate Rate

AMMWF asserts that Commerce failed to explain that use of the expected method here was necessary because if Jinlong's rate was not an AFA-based rate and not a zero or *de minimis* rate, Commerce should

have used Jinlong's margin alone as a basis for the separate rate.

MJAR at 23.  However, AMMWF did not raise this argument in its

administrative case brief.  *See* AMMWF Administrative Brief, P.R. 259,

at 3-8, Appx___.  As such, AMMWF failed to exhaust its administrative

remedies with respect to this argument.  *See* 28 U.S.C. § 2637(d); *see*

*also Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir.

2017).

Courts and Commerce regulations require parties to exhaust

administrative remedies before the agency by raising all issues in their

initial case briefs before Commerce.  *See Dorbest Ltd. v. United States*,

604 F.3d 1363, 1375 (Fed. Cir. 2010); *Qingdao Sea-Line Trading Co. v.*

*United States*, 766 F.3d 1378, 1388 (Fed. Cir. 2014); *see also* 19 C.F.R. §

351.309(c)(2).  And the Court "generally takes a 'strict view' of the

requirement that parties exhaust their administrative remedies before

the Department of Commerce in trade cases."  *Corus Staal BV v. United*

*States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007).

Moreover, no exceptions to the exhaustion doctrine are present in

this case, nor does AMMWF assert that any exist.  Exceptions to the

exhaustion requirement are limited, such as when taking a certain

action would be futile, the issue for the Court is a "pure question of law," when the plaintiff did not have timely access to the confidential record, or a new interpretation from an intervening judicial decision would impact the agency's action. *Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1146 (Fed. Cir. 2013); *Philipp Bros. v. United States*, 630 F. Supp. 1317, 1319 (1986); *See Luoyang Bearing Factory v. United States*, 240 F. Supp. 2d 1268, 1297 n.26 (Ct. Int'l Trade 2002). There is no evidence that such an argument would have clearly been "futile." *See Itochu Bldg. Prods.*, 733 F.3d at 1146. AMMWF had an opportunity to raise any argument regarding Commerce's separate rate methodology in its case brief. Indeed, AMMWF's administrative briefs contained substantial comments addressing Commerce's determination to not include Jinlong's China-wide entity rate in employing the expected method to calculate the separate rate, however no argument was presented challenging Commerce's determination to employ the expected method to begin with. *See* AMMWF Administrative Brief, P.R. 259, at 3-8, Appx____.

Further, the issue for the Court is not a "pure question of law" that can be addressed without further factual development or further

agency exercise of discretion.  *Itochu Bldg. Prods.*, 733 F.3d at 1146.

The pure question of law exception applies when (1) plaintiff raises a

new argument; (2) this argument is of a purely legal nature; (3) the

inquiry requires neither further agency involvement nor additional fact

finding or opening up the record; and (4) the inquiry neither creates

undue delay nor causes expenditure of scarce party time and resources.

*Zhongce Rubber Group Co. Ltd., v. United States*, 352 F.Supp.3d 1276,

1279-80 (Ct. Int'l Trade 2018).  When "the question is whether the

methodology is justifiable" then the resolution of that question requires

that a "factual record needs to be developed."  *Stanley Works (Langfang)*

*Fastening Sys. Co. v. United States*, 279 F. Supp. 3d 1172, 1190 (Ct.

Int'l Trade 2017) (determining that the pure legal question exception

could not apply when the court would have to assess Commerce's

justifications for its practice); *see also Mittal Steel Point Lisas*, 548 F.3d

at 1384; *Fuwei Films (Shandong) Co. v. United States*, 791 F. Supp. 2d

1381, 1384–85 (Ct. Int'l Trade 2011).

The propriety of Commerce's determination that the expected

method was applicable to calculating the separate rate turns on the

exercise of Commerce's discretion and application of its expertise in

calculating rates in non-market economy cases, namely where one mandatory respondent received the China-wide entity rate that was not subject to change in the period of review and the other mandatory respondent received a zero rate. *See Corus Staal*, 502 F.3d at 1380; *see also Consol. Bearings Co. v. United States*, 348 F.3d 997, 1004 (Fed. Cir. 2003). Thus, the pure question of law exception does not apply.

Moreover, Jinlong had timely access to the confidential record and has not claimed that it did not have such timely access. *See Philipp Bros.*, 630 F. Supp. at 1319. There is also no claim or evidence of an intervening judicial decision that would have affected Commerce's determination to employ the expected method in these circumstances. *See Luoyang Bearing Factory*, 240 F. Supp. 2d at 1297 n.26.

Additionally, apart from a failure to exhaust administrative remedies, this Court has recognized that the failure to raise an argument in an administrative case brief, as required by 19 C.F.R. § 351.309, is an independent basis to decline to entertain a new argument. *See Corus Staal*, 502 F.3d at 1379 (explaining that in the context of 19 C.F.R. § 351.309 the exhaustion requirement "is therefore not simply a creature of court decision, as is sometimes the case, but is

39

a requirement explicitly imposed by the agency as a prerequisite to judicial review"); *see also Samsung Electronics Co. Ltd., v. United States*, 72 F. Supp. 3d 1359, 1371 (Ct. Int'l Trade 2015) ("A violation of Commerce's regulation, therefore, supplies an independent ground for determining that an argument has not been exhausted."). As AMMWF's administrative case brief does not reflect its new arguments, the Court should therefore not consider these arguments.

Should the court entertain plaintiff's argument, as detailed above, Commerce explained the reasonable basis for applying the expected method in determining the separate rate. *See* IDM at 20, Appx____. Because the China-wide entity was not under review and Jinlong was found to be part of the China-wide entity and assigned the corresponding China-wide rate, Commerce did not consider Jinlong's China-wide margin for purposes of calculating the separate rate. *Id*. Therefore, because the only remaining rate for the individually examined companies was Senmao's zero rate, Commerce properly determined that it could rely on the expected method as "any reasonable method" to calculate the separate rate in accordance with

the statute and SAA.  IDM at 20, Appx____ (citing 19 U.S.C. §

1673d(c)(5)(B) and SAA at 873).

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court deny

AMMWF's motion for judgment on the agency record and sustain

Commerce's final results in its entirety.

<table>
<tr><td></td><td>Respectfully Submitted,</td></tr>
<tr><td></td><td>BRIAN M. BOYNTON<br>Principal Deputy Assistant<br>Attorney General</td></tr>
<tr><td></td><td>PATRICIA M. MCCARTHY<br>Director</td></tr>
<tr><td></td><td><u>s/ Tara K. Hogan</u><br>TARA K. HOGAN<br>Assistant Director</td></tr>
<tr><td></td><td><u>s/ Brendan Jordan</u><br>Brendan Jordan<br>Trial Attorney<br>Commercial Litigation<br>Branch Civil Division</td></tr>
<tr><td>OF COUNSEL:</td><td>United States Department of<br>Justice</td></tr>
<tr><td>RACHEL BOGDAN<br>Attorney<br>Office of the Chief Counsel<br>for Trade Enforcement and<br>Compliance<br>United States Department of<br>Commerce<br>Washington, D.C.</td><td>P.O. Box 480<br>Ben Franklin Station<br>Washington, D.C.<br>Tel: (202) 616-0342</td></tr>
</table>

July 1, 2022                                    Attorneys for Defendant

# **GLOSSARY**

**AMMWF**
American Manufacturers of Multilayered Wood Flooring

**IDM**
Issues and Decision Memorandum

**Jinlong**
Fusong Jinlong Group

**NME**
Non-Market Economy

**PDM**
Preliminary Decision Memorandum

**SAA**
Statement of Administrative Action

**Senmao**
Jiangsu Senmao Bamboo and Wood Industry Co., Ltd.

**SRC**
Separate Rate Certification

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the Rules of this Court and the Court's scheduling order in that it contains 7468 words, including text, footnotes, and headings. The estimate was computed using the word count feature in Microsoft Word.

/s/Brendan D. Jordan

Brendan D. Jordan