A-570-970<br>
Remand<br>
Court No. 21-00595<br>
POR:  12/1/2018 – 11/30/2019<br>
**Public Document**<br>
E&C/OVIII:  AC

*American Manufacturers of Multilayered Wood Flooring v. United States*,
**Court No. 21-00595 (CIT March 21, 2023)**
**Multilayered Wood Flooring from the People's Republic of China**

FINAL RESULTS OF REDETERMINATION
PURSUANT TO REMAND ORDER

I. SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of redetermination pursuant to the U.S. Court of International Trade's (CIT or the Court) remand order in *American Manufacturers of Multilayered Wood Flooring v. United States*, Court No. 21-00595 (March 21, 2023) (*Remand Order*).  The *Remand Order* concerns the final results of the 2018-2019 administrative review of the antidumping duty (AD) order on multilayered wood flooring (MLWF) from the People's Republic of China (China).[1]  In its *Remand Order*, the Court directed Commerce to reconsider whether mandatory respondent Fusong Jinlong Group (Jinlong) was eligible for a separate rate based on its separate rate certification (SRC), notwithstanding its failure to respond to Commerce's antidumping questionnaire.[2]  The Court held that, because Commerce accepted SRCs for other non-individually examined respondents as sufficient evidence to grant separate rates, this disparate treatment of respondents who appear to be similarly situated is arbitrary and capricious.[3]

---

[1] *See Multilayered Wood flooring from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Partial Rescission; 2018-2019*, 86 FR 59987 (October 29, 2021) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM); *see also Multilayered Wood Flooring from the People's Republic of China:  Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 76 FR 76690 (December 8, 2011) (*Order*).
[2] *See Remand Order* at 1.
[3] *Id.*

On June 9, 2023, we released the draft results of redetermination to interested parties, in which we evaluated Jinlong's eligibility for a separate rate based on its SRC and assigned Jinlong a separate rate based on record information, and assigned Jinlong a weighted-average dumping margin based on adverse facts available (AFA) in accordance with sections 776(a) and (b) of the Tariff Act of 1930, as amended (the Act), because Jinlong did not cooperate to the best of its ability by responding to the antidumping questionnaire.[4] We also recalculated the separate rate to be assigned to the eligible companies not selected for individual examination.[5] On June 16, 2023, we received timely comments from the American Manufacturers of Multilayered Wood Flooring (AMMWF) and Jiangsu Guyu *et al*.[6]

In Section III of these final results of redetermination, Commerce provides its analysis of the comments submitted by AMMWF and Jiangsu Guyu on the Draft Remand Redetermination included in Section II below.

## II.     REMANDED ISSUES

### A.     Jinlong's Separate Rate

#### 1.  Background

On February 6, 2020, Commerce published the notice of initiation of the eighth administrative review of the *Order*.[7] Commerce subsequently received an SRC from Jinlong.[8]

---

[4] *See* Draft Results of Remand Redetermination, *American Manufacturers of Multilayered Wood Flooring v. United States,* CIT Court No. 21-00595, dated March 21, 2023 (Draft Remand Redetermination).
[5] *Id.*
[6] *See* AMMWF's Letter, "Comments on Draft Results of Redetermination," dated June 16, 2023 (AMMWF's Comments).  *See also* Letter from Dongtai Fuan Universal Dynamics, LLC; Huzhou Sunergy World Trade Co., Ltd.; Jiangsu Guyu International Trading Co., Ltd.; Jiangsu Simba Flooring Co., Ltd.; Kemian Wood Industry (Kunshan) Co., Ltd.; Kingman Floors Co., Ltd; Sino- Maple (Jiangsu) Co., Ltd.; and Zhejiang Fuerjia Wooden Co., Ltd. (collectively, Jiangsu Guyu *et al*.), "Comments on Draft Remand Results," dated June 16, 2023 (Jiangsu Guyu *et al.*'s Comments).
[7] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 FR 6896 (February 6, 2020) (*Initiation Notice*).
[8] *See* Jinlong's Letter, "Separate Rate Certification," dated March 9, 2020.

2

Commerce selected Jinlong and Senmao Bamboo and Wood Industry Co., Ltd. (Senmao) as mandatory respondents and issued antidumping questionnaires to both companies.[9] On April 14, 2020, Jinlong notified Commerce that it did not intend to participate in the administrative review.[10]

In the *Final Results*, Commerce determined that Jinlong did not establish eligibility for a separate rate because it failed to respond to Commerce's Section A of the antidumping questionnaire, which included questions relevant to demonstrating eligibility for a separate rate.[11] Although Jinlong submitted an SRC on the record, Commerce explained that consistent with its *Initiation Notice* and prior practice, companies that file SRCs and are later selected as mandatory respondents are not considered eligible for a separate rate unless they respond to the antidumping questionnaire.[12] In denying Jinlong a separate rate, Commerce found that Jinlong was part of the China-wide entity which was subject to a weighted-average dumping margin of 85.13 percent. Commerce calculated a zero percent weighted-average dumping margin for Senmao.[13] Commerce assigned a zero percent weighted-average dumping margin to each of the separate-rate companies not individually examined in the review.

In its *Remand Order*, the Court ordered Commerce to reconsider whether Jinlong was eligible for a separate rate based on its submitted SRC. The Court held that because Commerce accepted SRCs for other non-individually examined respondents as sufficient evidence to grant a separate rate, this disparate treatment of respondents who appear to be

---

[9] *See Multilayered Wood Flooring from the People's Republic of China: Preliminary Results of the Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, Preliminary Successor in-Interest Determination, and Rescission of Review, in Part; 2018-2019*, 86 FR 22016 (April 26, 2021) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM).
[10] *See* Jinlong's Letter, "Jinlong Notice of Intent Not to Participate," dated April 14, 2020.
[11] *See Final Results* IDM at Comment 1.
[12] *Id.*
[13] *See Final Results*, 86 FR at 59988.

3

similarly situated was arbitrary and capricious.[14]

2. Analysis

*Separate Rate Determination for Jinlong*

Pursuant to section 771(18)(C) of the Act, in a proceeding involving a non-market-economy (NME) country, Commerce maintains the rebuttable presumption that all companies within the NME country are subject to government control and, thus, should be assessed a single antidumping rate.[15] It is Commerce's policy to assign all exporters of the merchandise subject to review in an NME proceeding a single rate unless an exporter can affirmatively demonstrate an absence of government control, both in law (*de jure*) and in fact (*de facto*), with respect to exports. To establish whether a company is sufficiently independent to be entitled to a separate, company-specific rate, Commerce analyzes each exporting entity in an NME proceeding under the test established in *Sparklers from China*,[16] as amplified by *Silicon Carbide from China*,[17] and further refined by *Diamond Sawblades from China*.[18] However, if Commerce determines that a

---

[14] *See Remand Order* at 1.
[15] *See* Enforcement and Compliance's Policy Bulletin No. 05.1, regarding, "Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries," (April 5, 2005), available on Commerce's website at https://access.trade.gov/Resources/policy/bull05-1.pdf; *see also Notice of Final Determination of Sales at Less Than Fair Value, and Affirmative Critical Circumstances, In Part: Certain Lined Paper Products from the People's Republic of China*, 71 FR 53079, 53082 (September 8, 2006); and *Final Determination of Sales at Less Than Fair Value and Final Partial Affirmative Determination of Critical Circumstances: Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 FR 29303, 29307 (May 22, 2006).
[16] *See Final Determination of Sales at Less Than Fair Value: Sparklers from the People's Republic of China*, 56 FR 20588 (May 6, 1991) (*Sparklers from China*).
[17] *See Notice of Final Determination of Sales at Less Than Fair Value: Silicon Carbide from the People's Republic of China*, 59 FR 22585 (May 2, 1994) (*Silicon Carbide from China*).
[18] *See Final Results of Redetermination Pursuant to Remand, Advanced Technology & Materials Co., Ltd. v. United States*, 885 F. Supp. 2d 1343 (CIT 2012), dated May 6, 2013, available at https://access.trade.gov/Resources/remands/12-147.pdf; sustained in *Advanced Technology & Materials Co. v. United States*, 938 F. Supp. 2d 1342 (CIT 2013), aff'd, Case No. 2014-1154 (Fed. Cir. 2014). *see also Diamond Sawblades and Parts Thereof from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 78 FR 77098 (December 20, 2013), and accompanying PDM at 7, unchanged in *Diamond Sawblades and Parts Thereof from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 35723 (June 24, 2014) (*Diamond Sawblades from China*), and accompanying IDM at Comment 1.

company is wholly foreign-owned, then an analysis of the *de jure* and *de facto* criteria is not necessary to determine whether it is independent from government control.[19]

In order to demonstrate separate rate status eligibility, Commerce normally requires entities for whom a review was requested, and which were assigned a separate rate in a previous segment of the proceeding, to submit an SRC stating that they continue to meet the criteria for obtaining a separate rate.[20]  Notwithstanding this practice, under protest, we evaluated the SRC on the record for Jinlong and find that Jinlong has rebutted the presumption of government control and is eligible for a separate rate for the sole purpose of calculating the rate for the separate rate respondents that have entries enjoined for this period of review because Jinlong is not a party to this litigation and does not have entries enjoined for this period of review.

*Application of Facts Available to Jinlong*

Sections 776(a)(1) and 776(a)(2)(A)-(D) of the Act provide that, if necessary information is not available on the record, or if an interested party:  (1) withholds information requested by Commerce; (2) fails to provide such information by the deadlines for submission of the information, or in the form and manner requested, subject to subsections (c)(1) and (e) of section 782 of the Act; (3) significantly impedes a proceeding; or (4) provides such information but the information cannot be verified as provided in section 782(i) of the Act, Commerce shall use, subject to section 782(d) of the Act, facts otherwise available in reaching the applicable determination. Section 782(c)(1) of the Act states that Commerce shall consider the ability of an interested party to provide information upon a prompt notification by that party that it is unable

---

[19] *See, e.g.*, *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China:  Final Results of the 2011-2012 Antidumping Duty Administrative Review and New Shipper Reviews*, 79 FR 4327 (January 27, 2014); and *Final Results of Antidumping Duty Administrative Review:  Petroleum Wax Candles from the People's Republic of China*, 72 FR 52355, 52356 (September 13, 2007).
[20] *See Initiation Notice.*

5

to submit the information in the form and manner required, and that party also provides a full explanation for the difficulty and suggests an alternative form in which the party is able to provide the information.

Section 782(e) of the Act states further that Commerce shall not decline to consider submitted information if all of the following requirements are met: (1) the information is submitted by the established deadline; (2) the information can be verified; (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination; (4) the interested party has demonstrated that it acted to the best of its ability; and (5) the information can be used without undue difficulties.

Finally, where Commerce determines that a response to a request for information does not comply with the request, section 782(d) of the Act provides that Commerce will so inform the party submitting the response and will, to the extent practicable, provide that party an opportunity to remedy or explain the deficiency. If the party fails to remedy or satisfactorily explain the deficiency within the applicable time limits, subject to section 782(e) of the Act, Commerce may disregard all or part of the original and subsequent responses, as appropriate.

After being selected as a mandatory respondent, Jinlong notified Commerce that it did not intend to participate further in the administrative review by responding to Commerce's request for information. Therefore, Jinlong withheld information requested by Commerce, failed to provide the requested information in the form and manner requested, and thus, significantly impeded the proceeding. As a result, the use of facts available under sections 776(a)(2)(A), 776(a)(2)(B), and 776(a)(2)(C) of the Act is warranted. As Jinlong did not provide the requested information, we also find that necessary information is not available on the record pursuant to section 776(a)(1) of the Act.

*Use of Adverse Inference*

Section 776(b) of the Act provides that, if Commerce finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information, Commerce may use an inference adverse to the interests of that party in selecting the facts otherwise available.  In addition, the SAA explains that Commerce may employ an adverse inference "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."[21]  Furthermore, affirmative evidence of bad faith on the part of a respondent is not required before Commerce may make an adverse inference.[22]  It is Commerce's practice to consider, in employing adverse inferences, the extent to which a party may benefit from its own lack of cooperation.[23]  We find that Jinlong failed to cooperate by not acting to the best of its ability to provide information when it declined to participate in the review.  Therefore, in accordance with section 776(b) of the Act, an adverse inference is warranted when selecting from among the facts otherwise available.[24]

---

[22] *See, e.g.*, *Nippon Steel Corp. v. United States*, 337 F. 3d 1373, 1382-83 (Fed. Cir. 2003); *Notice of Final Determination of Sales at Less Than Fair Value: Circular Seamless Stainless Steel Hollow Products from Japan*, 65 FR 42985 (July 12, 2000); and *Antidumping Duties; Countervailing Duties; Final Rule*, 62 FR 27296, 27340 (May 19, 1997).

[23] *See, e.g.*, *Steel Threaded Rod from Thailand:  Preliminary Determination of Sales at Less Than Fair Value and Affirmative Preliminary Determination of Critical Circumstances*, 78 FR 79670 (December 31, 2013), and accompanying PDM at 4, unchanged in *Steel Threaded Rod from Thailand:  Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, 79 FR 14476 (March 14, 2014).

[24] *See, e.g.*, *Large Power Transformers from the Republic of Korea:  Preliminary Results of Antidumping Duty Administrative Review; 2017-2018*, 84 FR 55559 (October 17, 2019), and accompanying PDM, unchanged in *Large Power Transformers from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 FR 21827 (April 20, 2020); *Non-Oriented Electrical Steel from Germany, Japan, and Sweden: Preliminary Determinations of Sales at Less Than Fair Value, and Preliminary Affirmative Determinations of Critical Circumstances, in Part*, 79 FR 29423 (May 22, 2014), and accompanying PDM at 7-11, unchanged in *Non-Oriented Electrical Steel from Germany, Japan, the People's Republic of China, and Sweden:  Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determinations of Critical Circumstances, in Part*, 79 FR 61609 (October 14, 2014); and *Notice of Final Determination of Sales at Less Than Fair Value: Circular Seamless Stainless Steel Hollow Products from Japan*, 65 FR at 42985, 42986 (July 12, 2000) (where Commerce applied total AFA when the respondent failed to respond to the antidumping questionnaire).

7

Section 776(b)(2) of the Act states that Commerce, when employing an adverse inference, may rely upon information derived from the petition, the final determination from the less-than-fair-value (LTFV) investigation, a previous administrative review, or other information placed on the record.[25]  In selecting a rate based on AFA, Commerce selects a rate that is sufficiently adverse to ensure that the uncooperative party does not obtain a more favorable result by failing to cooperate than if it had fully cooperated.[26]

When using facts otherwise available, section 776(c)(1) of the Act provides that, except as provided under section 776(c)(2) of the Act, where Commerce relies on secondary information (such as a rate from the petition) rather than information obtained in the course of an investigation or review, it must corroborate, to the extent practicable, information from independent sources that are reasonably at its disposal.  Secondary information is defined as information derived from the petition that gave rise to the investigation or review, the final determination from the LTFV investigation concerning the subject merchandise, or any previous review under section 751 of the Act concerning the subject merchandise.[27]  The SAA clarifies that "corroborate" means that Commerce will satisfy itself that the secondary information to be used has probative value.[28]  To corroborate secondary information, Commerce will, to the extent practicable, examine the reliability and relevance of the information to be used.[29]  Under section

---

[25] *See* 19 CFR 351.308(c).
[26] *See* SAA at 870.
[27] *Id.*
[28] *Id.*; *see also* 19 CFR 351.308(d).
[29] *See, e.g.*, *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, from Japan; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews*, 61 FR 57391, 57392 (November 6, 1996), unchanged in *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, from Japan; Final Results of Antidumping Duty Administrative Reviews and Termination in Part*, 62 FR 11825 (March 13, 1997).

776(c)(2) of the Act, Commerce is not required to corroborate any dumping margin applied in a separate segment of the same proceeding.

Finally, under section 776(d) of the Act, Commerce may use any dumping margin from any segment of a proceeding under an AD order when applying an adverse inference, including the highest of such margins.[30] The Act also makes clear that, when selecting an AFA margin, Commerce is not required to estimate what the dumping margin would have been if the interested party failing to cooperate had cooperated or to demonstrate that the dumping margin reflects an "alleged commercial reality" of the interested party.[31]

When assigning adverse rates in a review, Commerce's practice, consistent with section 776(b) of the Act, is to select as AFA the higher of: (a) the highest dumping margin alleged in the petition; or (b) the highest calculated rate for any respondent from any segment of the proceeding. Thus, for these final results of redetermination, Commerce applied the weighted-average dumping margin of 85.13 percent to Jinlong, which is the highest calculated rate for any respondent from a completed segment of the proceeding.[32] Because this rate was applied in a prior segment of the proceeding, Commerce need not corroborate it.

**B. Calculation of the Separate Rate for Non-Individually Examined Respondents**

  **1. Background**

In the *Final Results*, Commerce determined that it was reasonable to base the rate for the separate rate companies on Senmao's zero percent weighted-average dumping margin, consistent

---

[30] *See* sections 776(d)(1)-(2) of the Act.
[31] *See* sections 776(d)(3)(A) and (B) of the Act.
[32] This rate was assigned to the China-wide entity in *Multilayered Wood Flooring from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 FR 38002 (August 5, 2019) and remains unchanged. We did not select a rate derived from the petition because the petition rates could not be corroborated in the LTFV investigation and were never used in any subsequent segment of the proceeding.

9

with our practice in an administrative review.[33]

2. **Analysis**

The statute and Commerce's regulations do not address the establishment of a rate to be applied to individual respondents not selected for individual examination when Commerce limits its examination in an administrative review pursuant to section 777A(c)(2) of the Act. Generally, Commerce looks to section 735(c)(5) of the Act, which provides instructions for calculating the all-others rate in an investigation, for guidance when calculating the rate for separate-rate respondents which Commerce did not examine individually in an administrative review of an NME proceeding. Under section 735(c)(5)(A) of the Act, the all-others rate is normally "an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and *de minimis* margins, and any margins determined entirely {on the basis of facts available (FA)}." Accordingly, Commerce's usual practice in determining the rate for separate-rate respondents not selected for individual examination, has been to average the weighted-average dumping margins for the selected companies, excluding rates that are zero, *de minimis*, or based entirely on FA.[34]

However, when the estimated weighted-average dumping margins established for all individually investigated respondents are zero, *de minimis,* or based entirely on facts available, section 735(c)(5)(B) of the Act permits Commerce to "use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including

---

[33] *See Final Results* IDM at Comment 1.
[34] *See Longkou Haimeng Mach. Co. v. United States*, 581 F. Supp. 2d 1344, 1357-60 (CIT 2008) (affirming Commerce's determination to assign a 4.22 percent dumping margin to the separate-rate respondents in a segment where the three mandatory respondents received dumping margins of 4.22 percent, 0.03 percent, and zero percent, respectively); *see also Certain Kitchen Appliance Shelving and Racks from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 74 FR 36656, 36660 (July 24, 2009).

10

averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated." Furthermore, Congress, in the SAA, stated that when "the dumping margins for all of the exporters and producers that are individually investigated are determined entirely on the basis of the facts available or are zero or *de minimis* … {t}he expected method in such cases will be to weight-average the zero and the *de minimis* margins and margins determined pursuant to the facts available, provided that volume data is available."[35] The SAA continues that "if this method is not feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers, Commerce may use other reasonable means."[36]

For these final results of redetermination, we determined the weighted-average dumping margin for each of the individually examined respondents, Senmao and Jinlong, to be zero or based entirely on facts otherwise available, respectively. Because Jinlong did not respond to the antidumping questionnaire, the quantity and value of its sales during the review period is missing from the record. Therefore, it is not possible to calculate a weighted average of the rates for the mandatory respondents. Thus, we calculated the separate rate for all eligible non-examined respondents by taking the simple average of the weighted-average dumping margins determined for Senmao and Jinlong, which is 42.57 percent.

### III.    INTERESTED PARTY COMMENTS

*AMMWF's Comments*[37]

- Commerce should continue its decision to recalculate the margin applied to non-individually examined companies deemed eligible for a separate rate for the final results of redetermination. The rate calculated in the Draft Remand Redetermination is consistent with the statute and the "expected methodology" outlined in the SAA, as it

---

[35] *See* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316 at 873 (1994) (SAA).
[36] *Id.*
[37] *See* AMMWF's Comments.

- incorporates the weighted-average dumping margins calculated for both mandatory respondents.
- The recalculated separate rate is reasonably reflective of the potential dumping of the separate rate companies, *i.e.*, the resulting margin of 42.57 percent is consistent with the margin of 39.27 percent calculated for the mandatory respondent and applied to the separate rate companies in the subsequent administrative review, as well as the rate applied to the separate rate companies in prior reviews.[38]
- Further, the Draft Remand Redetermination is consistent with the Court's order, as it no longer applies disparate treatment to similarly situated respondents.[39]
- Accordingly, for the final results of redetermination, Commerce should continue to find that Jinlong is not part of the China-wide entity, determine a weighted-average dumping margin for Jinlong based on AFA, and average Senmao's zero rate and Jinlong's AFA rate to calculate the separate rate applied to the non-individually-examined, separate-rate companies, *i.e.*, 42.57 percent.

*Jiangsu Guyu et al.'s Comments*[40]

- Commerce should not deviate from its prior practice by applying a separate rate to Jinlong in the above-captioned proceeding. In the *Final Results*, Commerce determined that Jinlong did not establish eligibility for a separate rate because it failed to respond to section A of Commerce's antidumping questionnaire. Thus, Commerce's determination in the *Final Results* was lawful and supported by substantial evidence.
- Jinlong was selected in the 2018-2019 AD administrative review as a mandatory respondent. As Commerce noted in the Draft Remand Redetermination, it is Commerce's practice that companies which file SRCs and are later selected as mandatory respondents "are not considered eligible for a separate rate unless they respond to the antidumping questionnaire."[41] Pursuant to this practice, Jinlong failed to rebut the presumption of government control.[42] As a result, Commerce should review the evidence available on the record and reaffirm its finding from the *Final Results* that Jinlong was not eligible for a separate rate.
- Commerce's decision in the Draft Remand Redetermination effectively renders its respondent selection process and section A questionnaire null, and, ultimately, unnecessary.
- In the Draft Remand Redetermination, Commerce deviated from its prior practice by assigning, under protest, a separate AFA-based rate to Jinlong and recalculating the weighted-average dumping margin applied to non-examined, separate-rate respondents.[43] The purpose of AFA is to incentivize cooperation, not to impose unjustly injurious

---

[38] *Id.* at 3 (citing *Multilayered Wood Flooring from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 FR 39464 (July 1, 2022); and *Multilayered Wood Flooring from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 FR 38002 (August 5, 2019)).
[39] *Id.* (citing the *Order*).
[40] *See* Jiangsu Guyu *et al.*'s Comments.
[41] *Id.* at 2 (citing Draft Remand Redetermination at 2-3).
[42] *Id.* (citing *Final Results* IDM at 18; and *Preliminary Results* PDM at 12).
[43] *Id.* at 3 (citing Draft Remand Redetermination at 9-10).

12

results.[44] However, the Draft Remand Redetermination essentially punishes the non-examined, separate-rate respondents punitively injured – despite their full cooperation pursuant to Commerce's requirements – by receiving a high weighted-average dumping margin, based on AFA. This new, AFA-based rate applied to the non-examined respondents is *prima facie* punitive, injurious, and fails to adhere to the purpose of the statute.

- Commerce has a duty to calculate dumping margins as "accurately as possible"[45] and in a way that is "fair and equitable."[46] Commerce's Draft Remand Redetermination fails to satisfy these obligations because its revised weighted-average dumping margin for non-examined, separate-rate respondents is based on a calculation that it made only under protest and finding AFA, rather than a rate based on the most accurate information possible.
- While each case is *sui generis*, the application of this AFA-based weighted-average dumping margin to cooperative non-selected respondents leads to an aberrational result, far exceeding the separate rates assigned in all other periods of review. Lacking any other support in the record, the contrast drawn by such an aberrational weighted-average dumping margin is indicative that this recalculation does not reflect as "accurately as possible" an appropriate weighted-average dumping margin for the non-examined respondents.
- For the final results of redetermination, Commerce should decline to extend the scope of the *Remand Order* to require such an unjust revision of the weighted-average dumping margin for non-examined, separate-rate respondents.
- The SAA also allows Commerce to deviate from the expected method of margin calculations in certain circumstances. Here, Commerce's recalculation of the weighted-average dumping margin applied to non-examined, separate-rate respondents in its Draft Remand Redetermination is not "feasible" and it "results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers."[47]
- If Commerce nonetheless determines to recalculate the weighted-average dumping margin assigned to the non-examined, separate-rate respondents for the final results of redetermination, then it should deviate from the expected method and decline to apply the punitive AFA margin to the cooperative non-examined, separate-rate respondents as permitted by the SAA.

**Commerce's Position:** For these final results of redetermination, we determine, under

respectful protest, that Jinlong is eligible for a separate rate based on record information, and to

---

[44] *Id.* (citing *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000) ("{T}he purpose of section 1677e(b) is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins.")).
[45] *Id.* (citing *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370, 1379 (Fed. Circ. 2013) (*Yangzhou Bestpak*) ("An overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible.")).
[46] *Id.* at 3-4 (citing *Koyo Seiko Co., Ltd. v. United States*, 36 F.3d 1565, 1573 (Fed. Cir. 1994) ("We begin by noting that one of the purposes of the antidumping laws is to calculate antidumping duties on a fair and equitable basis.")).
[47] *Id.* at 4 (citing SAA at 873).

13

assign Jinlong a weighted-average dumping margin based on AFA.  While Jiangsu Guyu *et al.* argue that Jinlong did not establish its eligibility for a separate rate because it failed to respond to section A of the antidumping questionnaire once selected as a mandatory respondent despite initially submitting an SRC, the Court determined that not relying on Jinlong's SRC to determine eligibility for a separate rate is arbitrary and capricious.  Therefore, to comply with the Court's order, we examined Jinlong's SRC and continue to grant a separate rate to Jinlong.  Further, we continue to find that Jinlong did not cooperate to the best of its ability to respond to Commerce's antidumping questionnaire, and we are assigning Jinlong a weighted-average dumping margin based on AFA, *i.e.*, 85.13 percent.

Regarding the calculation of the separate rate, consistent with *Albemarle*[48] and our practice, we have continued to apply the expected method under section 735(c)(5)(B) of the Act, to determine a rate for the non-examined, separate-rate respondents in this review.  Specifically, we continue to assign a rate reflecting a simple average of the weighted-average dumping margins for the mandatory respondents that are zero, *de minimis* or based entirely on FA to those companies that were requested, and initiated, for review, but were not selected for individual examination and which are eligible for a separate rate.

We disagree with Jiangsu Guyu *et al.*'s argument that the 42.57 percent rate leads to an aberrational result or was not accurately calculated.[49]  There is a well-established basis both in law and Commerce's practice to calculate a non-examined respondent's weighted-average dumping margin based on the mandatory respondents' rates.  In *Albemarle*, the Federal Circuit explained that "the very fact that the statute contemplates using data from the largest volume

---

[48] *See, e.g., Albemarle Corp. v. United States*, 821 F. 3d 1345, 1352 ("The expected method in such cases will be to weight-average the zero and *de minimis* margins and margins determined pursuant to the facts available, provided that volume data is available.").
[49] *See* Jiangsu Guyu *et al.*'s Comments at 3.

14

exporters suggests an assumption that those data can be viewed as representative of all exporters."[50]  The Court further held that "the statute assumes that, absent such evidence, reviewing only a limited number of exporters will enable Commerce to reasonably approximate the margins of all known exporters."[51]  In addition, the CIT has also held that "{t}he representativeness of the investigated exporters is the essential characteristic that justifies an 'all others' rate based on a weighted average for such respondents."[52]  There is no basis to conclude that the dumping by the non-examined, separate-rate respondents is different from the mandatory respondents in this review.

    Jiangsu Guyu *et al.* also argue that we should deviate from the expected method and exclude the weighted-average dumping margin that is based on total AFA because it is not reasonably reflective of the non-examined, separate-rate respondents' dumping.  In support of this argument, Jiangsu Guyu *et al.* do not cite to record evidence which demonstrates that the 42.57 percent rate is not reasonably reflective of their potential dumping in this review.  Jiangsu Guyu *et al.* generally reference "separate rates assigned in all other periods of review" that they allege are far lower than the 42.57 percent rate calculated here.[53]  However, there have been several above *de minimis* rates calculated for separate-rate respondents in the history of this proceeding, two of which are either identical or similar to the rate calculated for the non-examined, separate-rate respondents in this review:  (1) a 3.92 percent rate calculated in second review; (2) a 42.57 percent rate calculated for separate rate respondents in the sixth review[54]; and (3) a 39.27 percent rate calculated in the ninth review.  Therefore, Jiangsu Guyu *et al.* have failed

---

[50] *See Albemarle*, 821 F.3d 1345, 1353.
[51] *Id.*
[52] *See Nat'l Knitwear & Sportswear Ass'n v. United States*, 779 F. Supp. 1364, 15 C.I.T. 548, 559 (1991).
[53] *See* Jiangsu Guyu *et al.*'s Comments at 3-4.
[54] This rate is subject to ongoing litigation which is not yet final and conclusive.

to demonstrate that the 42.57 percent rate is not reasonably reflective of the potential dumping by non-examined, separate-rate companies during this period of review.  In addition, we do not find that calculating the 42.57 percent rate pursuant to the expected method is not feasible.  Thus, we disagree with Jiangsu *et al.* and find that there is no basis to depart from the expected method.[55]

In addition, we disagree with Jiangsu Guyu *et al.*'s argument that the weighted-average dumping margin for non-examined, separate-rate respondents punitively injures fully cooperative respondents because it is partially based on an AFA rate.[56]  As a matter of law, Commerce may include an AFA rate in calculating the rate for respondents not selected for individual examination pursuant to section 735(c)(5)(A) of the Act.  As described above, when the weighted-average dumping margins established for all individually examined respondents are zero, *de minimis,* or based entirely on facts available, section 735(c)(5)(B) of the Act permits Commerce to "use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated." Furthermore, Congress, in the SAA, states that when "the dumping margins for all of the exporters and producers that are individually investigated are determined entirely on the basis of the facts available or are zero or *de minimis* … {t}he expected method in such cases will be to weight-average the zero and the *de minimis* margins *and margins determined pursuant to the facts available*, provided that volume data is available."[57]   Therefore, Commerce acted in accordance with the statute and the SAA by including Jinlong's AFA rate when averaging the

---

[55] *See Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006, 1012 (Fed. Cir. 2017) ("Under *Albemarle*, Commerce could not deviate from the expected method unless it found, based on substantial evidence, that the separate-rate firms' dumping is different from that of the mandatory respondents.").
[56] *See* Jiangsu Guyu *et al.*'s. Comments at 3.
[57] *See* SAA at 873.

rates assigned to Senmao and Jinlong to calculate the rate for non-individually-examined respondents. The courts have also recognized the lawfulness of averaging the mandatory respondents' rates, including AFA rates, to determine the rate for non-individually examined respondents.[58]

## IV.     FINAL RESULTS OF REDETERMINATION

Pursuant to the *Remand Order*, Commerce: (1) evaluated Jinlong's eligibility for a separate rate based on its SRC and assigned Jinlong a weighted-average dumping margin based on AFA for purposes of the final results of redetermination; and (2) recalculated the dumping margin assigned to the eligible separate-rate companies not selected for individual examination.[59] In these final results of redetermination, Commerce has considered AMMWF's and Jiangsu Guyu *et al.*'s comments. In light of our analysis, we have made no changes to the Draft Remand Redetermination.

X 
_____
Signed by: LISA WANG
Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

---

[58] *See Yangzhou Bestpak*, 716 F.3d at 1370, 1378 (rejecting an argument that Commerce may not include an AFA rate in calculation of a separate rate, holding that {section 735}(c)(5)(B) {of the Act} and the SAA explicitly allow Commerce to factor both de minimis and AFA rates into the calculation methodology."); *see also Bosun Tools Co., Ltd. v. U.S.*, Ct. No. 2021-1930, 2022 WL 94172 at *4 (Fed. Cir. 2022) ("As explained above, {section 735}(c)(5)(B) {of the Act} provides that Commerce may factor an AFA rate into its calculation of a separate rate. The SAA reinforces the statute. It provides that relying on an AFA rate is not only permitted, but expected."); *see also Solianus Inc. v. United States*, 391 F. Supp. 3d 1331 (CIT 2019) (sustaining Commerce's calculation of an all-others rate derived from a simple average of the dumping margins from three mandatory respondents which included two AFA rates and one *de minimis* rate.).
[59] *See* Attachment, identifying eligible separate rate companies to be assigned the revised separate rate.

Attachment

| Non-Selected Companies Under Review Receiving a Separate Rate |
|---|
| A&W (Shanghai) Woods Co., Ltd. |
| Arte Mundi (Shanghai) Aesthetic Home Furnishings Co., Ltd. (successor-in-interest to Scholar Home (Shanghai) New Material Co., Ltd.) |
| Benxi Wood Company |
| Dalian Jiahong Wood Industry Co., Ltd. |
| Dalian Kemian Wood Industry Co., Ltd. |
| Dalian Penghong Floor Products Co., Ltd./Dalian Shumaike Floor Manufacturing Co., Ltd. |
| Dongtai Fuan Universal Dynamics, LLC |
| Dun Hua Sen Tai Wood Co., Ltd. |
| Dunhua City Hongyuan Wood Industry Co., Ltd. |
| Dunhua Shengda Wood Industry Co., Ltd |
| Hailin Linjing Wooden Products Co., Ltd. |
| Hunchun Xingjia Wooden Flooring Inc. |
| Huzhou Chenghang Wood Co., Ltd |
| Huzhou Fulinmen Imp. & Exp. Co., Ltd. |
| Huzhou Jesonwood Co., Ltd. |
| Huzhou Sunergy World Trade Co., Ltd. |
| Jiangsu Guyu International Trading Co., Ltd |
| Jiangsu Keri Wood Co., Ltd. |
| Jiangsu Mingle Flooring Co., Ltd |
| Jiangsu Simba Flooring Co., Ltd. |
| Jiashan HuiJiaLe Decoration Material Co., Ltd. |
| Jiashan On-Line Lumber Co., Ltd. |
| Jiaxing Hengtong Wood Co., Ltd. |
| Kemian Wood Industry (Kunshan) Co., Ltd. |
| Kingman Floors Co., Ltd. |
| Linyi Youyou Wood Co., Ltd. |
| Metropolitan Hardwood Floors, Inc. |
| Pinge Timber Manufacturing (Zhejiang) Co., Ltd. |
| Sino-Maple (Jiangsu) Co., Ltd. |
| Suzhou Dongda Wood Co., Ltd. |
| Tongxiang Jisheng Import and Export Co., Ltd. |
| Yihua Lifestyle Technology Co., Ltd. (successor-in-interest to Guangdong Yihua Timber Industry Co., Ltd.) |
| Zhejiang Dadongwu Greenhome Wood Co., Ltd. |
| Zhejiang Fuerjia Wooden Co., Ltd |
| Zhejiang Longsen Lumbering Co., Ltd. |